UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| LAVONNE REYONOLDS WHITE, individually and as Special Administratrix for the Estate of INEZ TWO ELK WHITE, | ) ) ) ) ) | CIV. 11-5058-JLV |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION** |
| vs. | ) ) ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | | |

## INTRODUCTION

This matter is before the court on plaintiff Lavonne Reynolds White's[1] complaint alleging negligence against the United States of America ("the government") under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680.   The government moves in a combined motion for dismissal or for summary judgment in its favor.   See Docket No. 23.   The district court, the Honorable Jeffrey L. Viken, Chief Judge, referred this motion to this magistrate judge for a report and recommended disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[1] This action, begun on July 11, 2011, was originally captioned in the names of Lavonne Reynolds White and Inez Two Elk White.   See Docket No. 1.   However, Ms. Two Elk White died approximately one year later, on August 18, 2012.   See Docket No. 22.   Thereafter, Ms. White was appointed special administratix of Ms. Two Elk White's estate and, in that representative capacity, Ms. White was substituted for Ms. Two Elk White.   See Docket No. 33.

## FACTS

The following facts are taken from the parties' submitted statements of undisputed facts.   Factual disagreements are as noted.   On July 4, 2008, Ms. White and her mother, Inez Two Elk White, were returning from the Rosebud Sioux Indian Reservation to their home in Wanblee, South Dakota, on the Pine Ridge Indian Reservation in an auto driven by Ms. White.   They left Rosebud at approximately midnight.[2]

Sometime in the early morning hours[3] of July 5, 2008, the Whites' auto struck a cow or cows on South Dakota State Highway 44 approximately two miles east of the intersection between Highway 44 and South Dakota State Highway 73.   The Whites' vehicle left the roadway as a consequence of the collision with the cow(s), broke through a fence, and traveled into a ravine, where it came to a stop.   Both women inside the vehicle were rendered unconscious. Accordingly, neither of them notified law enforcement of their accident or

---

[2] The Rosebud reservation is on Central Time, while the Pine Ridge reservation is on Mountain Time, an hour behind Central Time.   To avoid confusion, all times are stated in terms of their equivalent in Mountain Time.   The Whites actually left Rosebud, South Dakota, at approximately 1:00 a.m. Central Time, which would have been midnight Mountain Time.

[3] Ms. White continually states that the accident occurred between the late evening hours of July 4 and the early morning hours of July 5.   However, she admits that she was discharged from the Indian Health Services ("IHS") Hospital at Rosebud, South Dakota, at 1:00 a.m. Central Time, which was midnight Mountain Time.   After her discharge from the IHS facility, she and Ms. White had to travel approximately sixty miles to reach the scene of the accident.   The journey home began on July 5.   Therefore, her accident must have occurred after midnight Mountain Time in the early morning hours of July 5, 2008.

requested assistance.   The accident occurred within the boundaries of the Pine Ridge Indian Reservation.

Between 12:30 a.m. and 1:30 a.m. on July 5, 2008, the Oglala Sioux Tribe Public Safety Commission ( "OSTPSC") (law enforcement on Pine Ridge), received a call that a vehicle driven by Melissa Pattersen Huber hit a cow or cows on Highway 44 a few miles east of the intersection between Highways 73 and 44. Officer Larry Romero responded to the scene and spoke to Ms. Pattersen.[4] Officer Romero found a dead black cow on Highway 44 and a white cow on the shoulder of the Highway.   Officer Romero helped Ms. Patterson's father remove the black cow from the highway.

Officer Romero returned to the scene of the accident a few hours later at 4:30 a.m. on July 5, by which time it was light enough to take photographs, which he did.   At neither visit did Officer Romero notice any tire tracks leading off the highway, broken fences, or the Whites' auto.

At approximately 10:00 a.m. on July 5, Wes Zimiga, who lives near the scene of the Whites' accident, was out for a walk.   He noticed the dead cattle and saw the Whites' car.   Mr. Zimiga looked in the car, saw the two women, and called his sister, asking her to call an ambulance for Ms. White and her mother. Mr. Zimiga described the Whites' auto as being on the north side of Highway 44 near the approach to his residence.   Mr. Zimiga observed tracks on the highway,

---

[4] The parties refer to this woman as either "Huber" or "Pattersen."   Because "Pattersen" is predominately used by the parties, the court adopts that usage.

the approach where the White vehicle had been braking, and a broken fence. The auto appeared to have been traveling west on Highway 44 toward Wanblee, went off the road, across the approach, through a fence, and into a ditch.

On June 11, 2010, both Inez and Lavonne filed administrative claims with the Bureau of Indian Affairs ("BIA"), which is part of the Department of the Interior.   Officer Romero and the OSTPSC operate under a Public Law 93-638 contract with the BIA pursuant to the Indian Self-Determination and Education Assistance Act, § 4, 25 U.S.C. § 450b(j).   The administrative claims submitted to the BIA by both women contain an identical statement of their claims:

> In the late evening hours of 7/4/08 or early morning hours of 7/5/08, Lavonne Reynolds White was driving a motor vehicle in which her mother, Inez Two Elk White, was a passenger. Approximately 2 miles east of Highway 44's intersection with Highway 73 in Jackson County, the vehicle that Lavonne Reynolds [sic] was driving struck a cow or cows that were on the Highway 44. The vehicle careened off the Highway, ran into a ravine, and resulted in serious physical injuries to both Lavonne Reynolds White and Inez Two Elk White causing them to lose consciousness.
>
> The accident was reported to the Oglala Sioux Tribe Public Safety Department and its officers, including but not limited to Larry Romero, Gene Swift Hawk, LeRoy Wilcox, and Floyd Wilcox, responded to the scene.   However, they individually or as a group failed to make a reasonable, adequate, and proper investigation of the accident and did not locate the car that Lavonne Reynolds White was driving that was involved in the accident.   Lavonne Reynolds White and Inez White were unconscious inside the vehicle and in dire need of medical attention.   The action and conduct of the officers involved in the investigation of the accident was negligent.

See Docket Nos. 25-1, at 1, 3; 25-5, at 1, 3.

4

On January 24, 2011, the United States Department of the Interior, which oversees the BIA, issued a denial of both women's administrative claims.   See Docket Nos. 42-1; 42-2.   In those letters, the government characterizes the Whites' claims and the government's reason for denying the claims as follows:

> [Your] claim alleges that on July 4 or 5, 2008 police officers of the Oglala Sioux Tribe Department of Public Safety failed to make a reasonable, adequate and proper investigation of the collision between the 1999 Dodge occupied by Inez Two Elk White [and Lavonne Reynolds White] and one or more cows.   The claim states that after the accident the police failed to locate the 1999 Dodge[,] and Ms. Two Elk White [and Ms. White] [were] deprived of medical treatment and care as a result.   The Detail Call For Service Report reflects that the accident was reported to the police on July 5, 2008 at 11:23 A.M., the ambulance arrived at the scene of the accident at 11:43 A.M. and police arrived at 11:56 A.M.
>
> The claim fails to establish that a federal employee, or tribal employee covered by the FTCA [Federal Tort Claims Act] extension, committed a negligent or wrongful act cognizable under the FTCA. Therefore, the claim[s] filed for Inez Two Elk White [and Lavonne Reynolds White] [are] hereby denied.

See Docket No. 42-1, at 2; Docket No. 42-2, at 3.

After receiving the government's denial of their administrative claims, the Whites then timely commenced this action.   The Whites' complaint in this case alleges identical facts to the above recitation from their administrative complaint, with one addition to the last sentence: "but instead of being found were left in the crashed motor vehicle for approximately ten hours without medical attention and in need of medical care."   See Docket No. 1, ¶ 7.   In their complaint, instead of a bare

5

assertion of negligence, the Whites explained their theories of negligence as follows:

> The [BIA] . . . [was] negligent, including but not limited to the following:
>
> a. [F]ailing to make an adequate search for the vehicle;
> b. [F]ailing to get out of their police vehicles to search on foot for the vehicle;
> c. [F]ailing to follow proper police procedures to search for a vehicle involved in a motor vehicle accident;
> d. [F]ailing to arrange for an organized search with adequate personnel;
> e. [F]ailing to heed skid marks on the highway and into the ditch where the vehicle came to rest;
> f. [F]ailing to make arrangements for necessary lighting to be brought to the scene so sufficient light was available;
> g. [F]ailing to return to the scene at daybreak to renew the search; and
> h. [O]ther grounds as will be established at trial from the facts of this case.

See Docket No. 1, ¶ 8.

The government now moves to dismiss Ms. White's claims for lack of subject matter jurisdiction or for summary judgment in the government's favor.   Ms. White resists the government's motion.

## DISCUSSION

**A.    The Government's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)**

### 1.    The Applicable Standard

The FTCA allows suits for money damages against the government for harm caused by the negligence of government employees if the negligence was committed while the employee was acting within the scope of his or her

6

employment.   See 28 U.S.C. §§ 2674, 2675(a).   Torts committed by Indian tribal organizations or their employees are covered under the Federal Tort Claims Act ("FTCA") if the tort arises out of the execution of a "638 contract" under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450b(j). See Hinsley v. Standing Rock Child Protective Servs., 516 F.3d 668, 672 (8th Cir. 2008) (citing Dep't of the Interior and Related Agencies Appropriations Act, 1991, Pub. L. No. 101–512, Title III, § 314, 104 Stat. 1915, 1959–60 (1990) (codified at 25 U.S.C. § 450f notes)); see also 25 U.S.C. § 450f(d); 28 U.S.C. §§ 1346(b), 2671–2680.

Under the FTCA, prior presentation of an administrative claim to the appropriate federal agency is a jurisdictional prerequisite to bringing suit in district court.   See 28 U.S.C. § 2675(a); Mader v. United States, 654 F.3d 794, 805, 808 (8th Cir. 2011) (en banc); Farmers State Sav. Bank v. Farmers Home Admin., 866 F.2d 276, 277 (8th Cir. 1989).   That is because the United States, as sovereign, is immune from suit except where Congress has expressly, clearly, and unequivocally consented to suit.   Mader, 654 F.3d at 797, 807; Harvey v. Piersol, Civ. No. 03-4002-KES, 2003 WL 21790541, at *3 (D.S.D. June 27, 2003) (citing Miller v. Tony & Susan Alamo Found., 134 F.3d 910, 915 (8th Cir. 1998)). Therefore, district courts lack subject matter jurisdiction over claims against the government where such a waiver has not been made by Congress.   Mader, 654 F.3d at 797; Harvey, 2003 WL 21790541, at *3.   Waivers of sovereign immunity are strictly construed in favor of the sovereign.   Miller, 134 F.3d at 915.   The

7

FTCA is such a waiver of the government's sovereign immunity, but any tort claim that does not strictly comply with the requirements of the FTCA is not within the jurisdiction of federal district courts.   Mader, 654 F.3d at 807; Miller, 134 F.3d at 915; Farmer's State Sav. Bank, 866 F.2d at 277.

The government argues that the claim Ms. White now pursues in court is different than her administrative claim, and, therefore, has not previously been presented to the BIA.   Specifically, the government argues that Ms. White alleged in her administrative claim that the accident involving the *White vehicle* was reported contemporaneously to the OSTPSC and that officers then negligently failed to investigate.   Now, by contrast, the government argues that Ms. White is relying on the OSTPSC officers' negligent investigation of the *Pattersen accident*, which was reported some ten to twelve hours before Mr. Zimiga reported the Whites' accident.   The government argues that this court is deprived of jurisdiction because of the Whites' failure to specify in their administrative claims that it was the negligence in connection with responding to the dispatch call involving the Pattersen vehicle upon which they base their claims.   Motions to dismiss for lack of subject matter jurisdiction arise under Federal Rule of Civil Procedure 12(b)(1).   See FED. R. CIV. P. 12(b)(1).

A motion to dismiss under Rule 12(b)(1) "can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts."   Jessie v. Potter, 516 F.3d 709, 712 (8th Cir. 2008) (citing Osborn v. United States, 918 F.2d 724, 728–30

8

(8th Cir. 1990)).   If the motion is to be decided on disputed facts, the court may conduct an evidentiary hearing and make findings.   Id.   By contrast, if the argument is that the facts fail to state a claim, the motion must be resolved on the pleadings alone and a motion akin to summary judgment may not resolve disputed factual issues.   Id.

Here, there are no disputed facts with regard to the government's failure-to-administratively-exhaust argument, so there is no need for an evidentiary hearing to resolve the government's motion.   The Whites' statement of the basis of their claim in the administrative submission is known and undisputed.   Similarly, it is also known beyond dispute—now—that, while the Pattersen accident was reported contemporaneous to the Whites' accident, the Whites' accident itself was not reported until after 11:00 a.m. the next morning. It is also known, and not disputed, that, the OSTPSC promptly responded and rendered assistance to the Whites when the Whites' accident was reported. Finally, it is undisputed that the Whites' claim now rests on the allegation that the OSTPSC officers were negligent in responding to the Pattersen accident because they failed to take reasonable steps that would have led them to discover the Whites' vehicle at that time rather than many hours later.

## 2.   Application of the Standard to the Government's Argument

The purpose of requiring FTCA claimants to first present their claims to the appropriate administrative agency is to provide the agencies with an opportunity to investigate, determine, compromise, and settle tort claims

without the necessity of litigating the claim in federal district court.   Mader, 654 F.3d at 797–98, 803, 807.   The FTCA does not define what "presentment" of a claim to an administrative agency means.   Id. at 798.   The Eighth Circuit has held that a FTCA claimant satisfies the "presentment" requirement when the claimant states sufficient information in their administrative claim to allow the administrative agency "to meaningfully consider, ascertain, adjust, determine, compromise, deny, or settle FTCA claims prior to suit."   Id. at 800–01.   The administrative claim must also state a sum certain in damages being sought. Id. at 798.

The Mader court evaluated a regulation promulgated by the Attorney General, 28 C.F.R. § 14.2(a), defining what constitutes a "properly presented" administrative claim.   Id. at 798, 804.   That regulation provides that:

> [A] claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, [1] an executed Standard Form 95 or other written notification of an incident, [2] accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident; and [3] the title or legal capacity of the person signing . . . .

Id. at 798 (quoting 28 C.F.R. § 14.2(a)).   Although the Eighth Circuit, in Mader, declined to decide whether the Attorney General acted within the rulemaking power given to that office by Congress when section 14.2(a) was promulgated, it embraced the agency's definition "because § 14.2(a)'s interpretation of [28 U.S.C.] § 2675(a) is the interpretation 'we would adopt even if there were no formal rule and we were interpreting the statute from scratch.'"   Id. at 804

10

(quoting Edelman v. Lynchburg Coll., 535 U.S. 106, 114 (2002)).  The Eighth

Circuit "liberally construe[s] an administrative charge for exhaustion of remedies

purposes," but will not invent a claim which was simply not alleged.  Allen v.

United States, 590 F.3d 541, 544 (8th Cir. 2009) (quoting Parisi v. Boeing Co.,

400 F.3d 583, 585 (8th Cir. 2005)) (internal quotation marks omitted).

In Allen v. United States, the plaintiff sued the United States alleging that

an Air Force hospital was negligent in screening a blood transfusion, which

resulted in her contracting Hepatitis C, and that the Air Force negligently failed

recognize, diagnose, and treat her Hepatitis C.  Id. at 543.  Her statement of

her administrative claim alleged that she had "presented many times from 1997

to 2005 to the air force base medical personnel" and that "no test for Hepatitis

was ordered."  Id. at 544 (internal quotation marks omitted).  The court held

that this language failed to assert a claim of lack of informed consent.  Id.

Accordingly, the court dismissed Allen's informed consent claim for lack of

subject matter jurisdiction because that claim had not been submitted to the

administrative agency for determination.  Id.

In Mackovich v. United States, an inmate filed an administrative claim

against the government, alleging that he "Slipped and Fell on a Freshly mopped

Greasy Floor that did not have a warning sign posted due to the Negligence of

Officer Flanners, as a Direct result he Sustained Serious and Permanent

[injuries]."  Mackovich v. United States, 630 F.3d 1134, 1134 (8th Cir. 2011)

(per curiam).  The government argued that the administrative claim did not

present a claim for premises liability and, accordingly, should be dismissed for lack of subject matter jurisdiction.   Id.   The court disagreed, holding that Mackovich had properly exhausted his administrative remedies with regard to the premises liability claim, holding that his statement of his administrative claim encompassed that theory of liability.   Id.   The court's conclusion was based, in part, on the fact that the agency had asked for additional information from Mackovich while investigating his claim, and he provided additional details regarding his slip-and-fall claim, though he had never used the term "premises liability."   Id. at 1135–36.

In a decision issued by this court, a plaintiff's failure to use the words "tort" or "negligence" or "FTCA" in its administrative claim did not defeat the district court's jurisdiction.   See FGS Constructors, Inc. v. Carlow, 823 F. Supp. 1508, 1512–14 (D.S.D. 1993), aff'd in part, rev'd in part on other grounds, 64 F.3d 1230 (8th Cir. 1995).[5]   In that case, plaintiff FGS Constructors, Inc. sued the government under the FTCA for negligent failure to follow its own statutes and regulations and for the negligence of the government's project engineer.   Id. at 1511.   FGS had previously sent an administrative claim to the BIA stating a sum certain in damages and stating that the project engineer provided documents describing the condition of the reservoir upon, which bidding

---

[5] The Eighth Circuit affirmed the district court's ruling regarding plaintiff's claim against the United States under the FTCA, but reversed and remanded as to plaintiff's claims against private third parties.   See FGS Constructors, Inc. v. Carlow, 64 F.3d 1230, 1233–35 (8th Cir. 1995).

contractors relied in submitting their bids.   Id. at 1512–13.   The administrative claim, however, did not use the words "tort" or "negligence" nor did it invoke the FTCA.   Id. at 1513.   The court held that the failure to specify "tort," "negligence," or "FTCA" was not determinative.   Id.   The purpose of the administrative claim requirement under the FTCA is to give agencies notice of the claim being asserted with "sufficient information for the agency to investigate the claim, including at minimum the identity of the claimant and the bases for the claim."   Id. at 1512.   The court held that FGS's administrative claim satisfied this requirement because it informed the agency "of the injury, the circumstances of that injury, and the amount of damages."   Id. at 1513 (citing Santiago-Ramirez v. Sec'y of Dep't Def., 984 F.2d 16, 19–20 (1st Cir. 1993).

The court specifically stated that the presentment requirement of the FTCA does not require a claimant to specify its legal theories of recovery.   Id. Even if a claimant does specify legal theories in its administrative claim, "this is surplusage and does not jurisdictionally limit his theories in a subsequent court action."   Id. (citing Bush v. United States, 703 F.2d 491, 494 (11th Cir. 1983)). All that is required is that the administrative claim "fairly apprises the government of the facts leading to the claimant's injury," and "new theories of why those facts constitute tortious conduct can be included in a federal court complaint."   Id. (quoting Bush, 703 F.2d at 494 (quoting Rise v. United States, 630 F.2d 1068, 1071 (5th Cir. 1981))).

In the Bush case, as cited by the court in FGS Constructors, Inc., the

13

plaintiff sued for wrongful death as a result of a surgery at a Veteran's Administration ("VA") facility.   <u>Bush</u>, 703 F.2d at 493.   The administrative claim submitted to the VA listed the date of injury as a two-month period from March 1, 1976 to May 6, 1976, which was the date of the initial surgery up to the date of death.   <u>Id.</u> at 494.   As to the description of the claim, the plaintiff wrote "See Attached Hospital Summary, Autopsy Report, and Independent Medical Evaluation."   <u>Id.</u>   The attached report included a reference to the substandard post-operative care the VA provided to the decedent, although the report concluded that the post-operative care resulted in no harm to the decedent.   <u>Id.</u> at 495.   The court rejected the government's claim that the administrative claim did not include a claim for negligent post-operative care.   <u>Id.</u>

Applying these cases to the facts before the court, the court concludes that the Whites did satisfy the administrative presentment requirement.   The thrust of the Whites' statement of their claim in their administrative paperwork was that tribal police were present at the scene of their accident and, through their negligence, failed to discover the Whites as they lay unconscious in their vehicle nearby.   Whether the officers were at the scene of the accident due to a report of the Whites' accident, or due to a report of the Pattersen accident, is not significant.   The facts set forth by the Whites in their administrative claim gave the government sufficient information to "fairly apprise[] the government of the facts leading to the claimant's injury," such that the government was able to investigate those facts.   <u>FGS Constructors, Inc.</u>, 823 F. Supp. at 1513.   The

14

Whites even identified Officer Romero by name as one of the officers present at the scene of their accident, though they did not know at the time that Officer Romero was at the scene of the accident not once but twice, with the second visit occurring during the daylight.

Furthermore, the court notes that the government alone was in possession of the tribal police dispatch records for the late evening hours of July 4, 2008, and the early morning hours of July 5, 2008.   From those records, the government could ascertain that the Pattersen accident—at the same location as the Whites' accident—was reported to tribal police very close to the time the Whites' accident happened and that Officer Romero was one of the officers who responded to the Pattersen accident.   The information provided by the Whites to the government in their administrative claim was sufficient to satisfy their presentment requirement.   Accordingly, the court recommends denial of the government's motion to dismiss based on a lack of subject matter jurisdiction.

**B.    The Government's Motion for Summary Judgment**

In addition to the presentment argument discussed above, the government argues that Ms. White cannot sustain her claim of negligence because the tribal officers would not be liable under South Dakota state law.   This argument is asserted by the government pursuant to its request for summary judgment.

**1.    Standard Applicable to Summary Judgment Motions**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the

16

governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

### 2.   Application of the Standard to the Government's Arguments

The FTCA provides that the government "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." See 28 U.S.C. § 2674.   Further, the government is liable "under circumstances where . . . a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." See 28 U.S.C. § 1346(b)(1).   Because the facts alleged by Ms. White in support of her claim took place in South Dakota, it is the law of the state of South Dakota that applies to determine whether the government may be held

17

liable.   <u>Owen v. United States</u>, 645 F. Supp. 2d 806, 826 (D.S.D. 2009) (citing <u>LaFromboise v. Leavitt</u>, 439 F.3d 792, 794 (8th Cir. 2006)).

South Dakota negligence law requires a plaintiff to prove (1) a legal duty owed to the plaintiff by the defendant, (2) a breach of that duty by the defendant, (3) proximate and factual causation, and (4) damages.   <u>Hendrix v. Schulte</u>, 2007 S.D. 73, ¶ 7, 736 N.W.2d 845, 847.   Whether a duty exists is usually a question of law for the court to decide.   <u>Id.</u> at ¶ 8, 736 N.W.2d at 847 (citing <u>Erickson v. Lavielle</u>, 368 N.W.2d 624 (S.D. 1985).   Duty under South Dakota law can arise from a statute or from common law.   <u>Id.</u> at ¶ 7, 736 N.W.2d at 847.

The government argues that it is entitled to summary judgment based on application of South Dakota's "Good Samaritan" law. Alternatively, the government argues that the "private person analog," a doctrine of federal law which arises from the language of the FTCA, prevents liability in this matter.   The government also argues that it is entitled to judgment under the "public duty doctrine," a defense based on South Dakota state law.   Finally, the government argues that it is entitled to summary judgment because Ms. White cannot prove damages.   Each of these arguments is discussed below.

### a.    South Dakota's Good Samaritan Law

South Dakota has passed a so-called Good Samaritan law that provides as follows:

> No peace officer, conservation officer, member of any fire department, police department and their first aid, rescue or

18

emergency squad, or any citizen acting as such as a volunteer, or any other person is liable for any civil damages as a result of their acts of commission or omission arising out of and in the course of their rendering in good faith, any emergency care and services during an emergency which is in their judgment indicated and necessary at the time.   Such relief from liability for civil damages extends to the operation of any motor vehicle in connection with any such care or services.

Nothing in this section grants relief to any person causing any damage by his willful, wanton or reckless act of commission or omission.

See SDCL § 20-9-4.1.

The South Dakota Supreme Court appears to have first addressed this statute in 1997 in a situation factually obverse to this one—where a rescuer was injured and sought to hold the person who created the emergency liable.   See Thompson v. Summers, 1997 S.D. 103, 567 N.W.2d 387.   In that case, defendant Charles Summers was piloting a hot air balloon and attempted to land it in a public recreational area where plaintiff Marvin Thompson was located.   Thompson, at ¶ 2, 567 N.W.2d at 389.   Thompson, also a hot air balloon pilot, became concerned that Summers was going to drag his balloon into some nearby high voltage power lines.   Id.   In an attempt to avert this catastrophe, Thompson grabbed the basket of Summers' balloon in an attempt to stop it.   Id.   The balloon nevertheless collided with the electrical lines, and Thompson suffered severe electrical burns to over sixty percent of his body, while the passengers in the balloon were unharmed.   Id.

19

Thompson sued Summers, alleging that Summers was negligent in handling the hot air balloon and that Thompson was a foreseeable bystander that might intervene and be injured.   Id. at ¶ 3, 567 N.W.2d at 389.   Thompson argued that Summers was negligent per se because he violated several state and federal rules with regard to aircraft.   Id. at ¶¶ 16–18, 567 N.W.2d at 393–94.   Thompson also argued that Summers was negligent under the "rescue doctrine," which holds that one who jeopardizes the safety of another through his own negligence can be held liable for the injuries incurred by a "rescuer" who attempts to save the other from injury.   Id. at ¶ 8, 567 N.W.2d at 390–91.   The "rescue doctrine" had never been addressed by the South Dakota Supreme Court prior to the Thompson decision.   Id. ¶ 19, 567 N.W.2d at 394.   However, the court noted that the policy of the rescue doctrine was inherent in SDCL 20-9-4.1, which encourages citizens to provide "quick and courageous action in emergency situations."   Id. at ¶ 19, n.6, 567 N.W.2d at 394.

The only other time the South Dakota Supreme Court has addressed the Good Samaritan statute is in In re Certification of a Question of Law, 2010 S.D. 16, 779 N.W.2d 158.[6]   In that case, defendant Tim Bauman, a volunteer fire fighter, was driving his personal vehicle to the fire hall after

---

[6] Gronseth filed suit in United States District Court for the District of South Dakota, Southern Division.   See Gronseth v. Chester Rural Fire Protection Dist., Civ. 07-4163.   Judge Piersol certified the question of the application of the Good Samaritan statute to the South Dakota Supreme Court.   See id. at Docket No. 50.

receiving notification that a fire was in progress.   Id. at ¶ 2, 779 N.W.2d at 160.   Bauman was speeding and had his vehicle's flashing lights activated.   Id.   Bauman collided with a vehicle in which plaintiff Mandi Gronseth was a passenger, injuring Gronseth.   Id. at ¶ 3, 779 N.W.2d at 160.   Gronseth then sued Bauman and the Chester Fire Department for which Bauman was a volunteer.   Id. at ¶ 4, 779 N.W.2d at 160.

The In re Certification court noted that nearly every state in the union has enacted some version of a Good Samaritan statute, and that South Dakota's statute is one of the broadest in terms of the protection afforded to would-be rescuers.   Id. at ¶¶ 7–8, 779 N.W.2d at 161.   The court construed section 20-9-4.1 according to its plain meaning.   Id. at ¶ 12, 779 N.W.2d at 162.   "Emergency" meant "a sudden, urgent, usually unforeseen occurrence or occasion requiring immediate action."   Id. (internal quotation marks omitted) (citing WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 467 (1994)). "Render" meant "to do; perform; to furnish; provide."   Id. (internal quotation marks omitted) (citing WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1214 (1994)).   "Service" meant "an act of helpful activity; help; aid."   Id.   (internal quotation marks omitted) (citing WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1304 (1994)).

Applying these definitions to the facts of the case, the court found that the fire constituted an "emergency" within the meaning of the statute. Id. at ¶ 13, 779 N.W.2d at 162.   Bauman was clearly a member of a fire department within the meaning of the statute.   Id.   The Court held that because the sole reason Bauman was driving at the time of the accident was to travel to the fire station in response to a fire notification, he was rendering emergency aid at the time of the accident.   Id. at ¶¶ 13–14, 779 N.W.2d at 162–63.   Furthermore, the court held that the statute was not merely intended to shield Bauman from liability as to one in need of emergency aid, but to shield him from *all* liability for civil damages.   Id. at ¶ 14, 779 N.W.2d at 163.   Therefore, the court held that section 20-9-4.1 shielded Bauman from liability as to bystanders as well as those in need of emergency aid.   Id.   Thus, unless Gronseth could show that Bauman acted willfully, wantonly, or recklessly, the Good Samaritan statute shielded Bauman from liability for Gronseth's injuries.   Id. at ¶ 16, 779 N.W.2d at 163.

The court must apply Thompson and In re Certification to the facts of this case.   Officer Romero is clearly a "peace officer" or a "member of [a] . . . police department" within the meaning of section 20-9-4.1.   The Pattersen accident, when first reported, was clearly an "emergency"—it was "a sudden, urgent, . . . unforeseen occurrence or occasion requiring immediate action."   Id. at ¶ 12, 779 N.W.2d at 162.   The fact that

Ms. Pattersen was the person in need of emergency assistance and the Whites were undiscovered bystanders does not prevent the application of the statute.   Id. at ¶ 14, 779 N.W.2d at 163.   If the only negligence asserted by Ms. White was in connection with this middle-of-the-night event, Officer Romero and his employer, the government, would clearly be entitled to protection under SDCL 20-9-4.1.

However, Ms. White's claims of negligence are not based solely on Officer Romero's actions in the middle of the night.   Ms. White also alleges that Officer Romero was negligent in failing to notice the White vehicle when he returned to the scene of the accident at dawn on the morning of July 5 to take photographs.   During this dawn visit to the scene of the accident, Officer Romero was no longer responding to an emergency or rendering emergency care and services during an emergency.   The only "emergency" Officer Romero knew of was the Pattersen accident.   If Officer Romero was negligent in failing to notice the White's vehicle at dawn on July 5, then he is not protected by the Good Samaritan statute because his visit to the scene was not occasioned by an emergency.   There are facts from which a reasonable jury could find that Officer Romero was negligent. The fence was broken where the White vehicle had traveled through it, and there were skid marks or gouges on the road leading to the path the White vehicle traveled.   A reasonable jury could conclude that Officer Romero was negligent in failing to notice these signs in the light of day.

23

The court concludes that the government is not entitled to summary judgment on the basis of SDCL 20-9-4.1 because Ms. White's complaint contains allegations of negligence that are not related to actions taken in responding to an emergency.

### b.    The Private Person Analog

The government also urges that the private person analog prevents liability for the Whites' damages.   As the Second Circuit observed, "[t]he path of the case law on the FTCA's private analogue requirement is long, winding, and sparsely marked."  See Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012).   The doctrine stems from the FTCA's requirement that the government can only be held liable under circumstances where a private person would also be liable under state law.   See 28 U.S.C. §§ 1346(b)(1), 2674.   The private person analog requires that courts "look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA [even] 'in the performance of activities which private persons do not perform.'"   United States v. Olson, 546 U.S. 43, 46 (2005) (quoting Rayonier Inc. v. United States, 352 U.S. 315, 318–19 (1957)).   Tracing the history of the private person analog is helpful in understanding how that doctrine applies to this case.

The private person analog had its inception in Feres v. United States, 340 U.S. 135 (1950).   The Feres case involved three consolidated

24

cases of servicemen who were injured while on active duty in the armed forces.   Feres, 340 U.S. at 138.[7]   In analyzing the cases, the Supreme Court held that no private person has the power to draft or to mobilize a private army similar to the government's power over the armed forces.   Id. at 141–42.   Therefore, the court held that there could be no private person analog by which the government could be held liable under state law.   Id. at 146.   The government characterized the relationship between the government and military personnel as being uniquely and exclusively governed by federal law.   Id.

Five years later, the Court appeared to broaden its view of the private analog requirement in Indian Towing Co. v. United States, 350 U.S. 61 (1955).   In Indian Towing, a tug boat went aground after a lighthouse operated by the United States Coast Guard quit working when its battery failed.   Indian Towing Co., 350 U.S. at 62.   The government argued that it was not liable under the private person analog because private persons are not allowed to operate lighthouses and, therefore, no liability is provided for private persons negligently operating lighthouses.   Id. at 64. The Court rejected the government's argument, holding that the phrase "under like circumstances" did not mean "under the same circumstances." Id. at 64.   Instead, the Court looked to "Good Samaritan" law, which

---

[7] One plaintiff was killed in a fire in the barracks, one plaintiff was injured when an Army doctor left a towel in his abdomen during a surgery, and one plaintiff died as a result of a negligently performed surgery by an Army surgeon.   Feres, 340 U.S. at 136–37.

requires that one who undertakes to warn the public of danger and induces the public's reliance to carry out the warning with reasonable care.   Id. at 64–65.   The key inquiry was not whether private persons operated lighthouses; rather, the inquiry was if they were allowed to do so and acted without reasonable care, would they be liable under local law. Id. at 66–67.

The Court discussed the public analog doctrine again in Rayonier, Inc. v. United States, 352 U.S. 315 (1957).   In that case, a forest fire began on United States Forest Service property and, allegedly through negligence of the Forest Service, spread to the plaintiff's land.   Id. at 315–17.   The government argued, relying on Dalehite v. United States, 346 U.S. 15 (1953), that it was not liable because, under state law, municipal and local governments could not be held liable for damages resulting from their firefighting activities.   Id. at 318–19.   The Court rejected the government's argument under Dalehite, stating that to the extent Dalehite stood for the proposition that state law as to governmental liability had any application under the FTCA, Indian Towing had overruled that holding.[8] Id. at 319.   The court reiterated that the FTCA requires the court to look to local law which would be applicable to private citizens, not state law as to local governmental liability.   Id. at 319–21.

---

[8] The Eighth Circuit has likewise acknowledged that the continuing authority of the Dalehite case is "impaired" following Rayonier.   See United States v. LePatourel, 571 F.2d 405, 409 (8th Cir. 1978).

In <u>United States v. Muniz</u>, the Court next considered the private person analog in the context of a prisoner injured during confinement in a federal prison.   <u>United States v. Muniz</u>, 374 U.S. 150, 150 (1963). Drawing on <u>Feres</u>, the government argued that the relationship between a federal prisoner and the federal penitentiary was uniquely federal in character and, therefore, there was no private person analog.   <u>Id.</u> at 159. The Court rejected the application of <u>Feres</u> under these facts.   <u>Id.</u> at 162. Undertaking an extensive review of the legislative history of the FTCA spanning twenty-one years, the Court concluded that Congress passed the ultimate version of the FTCA in 1946 with knowledge and an expectation that it would encompass claims of federal prisoners.   <u>Id.</u> at 154–58.

Furthermore, the court noted that the law of many states allows state prisoners to recover against their jailers for negligent acts.   <u>Id.</u> at 159–60.   Finally, the Court noted that the duty of care owed by the Bureau of Prisons to federal prisoners was set forth by statute.   <u>Id.</u> at 164–65 (citing 18 U.S.C. § 4042).   Given such federal rules imposing a duty of due care, the Court held that federal prisoners' recovery under the FTCA should not be defeated even in cases where the state law does not allow for recovery.   <u>Id.</u> at 165.

The most recent Supreme Court pronouncement on the private person analog can be found in <u>United States v. Olson</u>, 546 U.S. 43 (2005). In <u>Olson</u>, the plaintiffs sued under the FTCA, alleging that negligent

27

inspections by the Mine Safety Heath Administration contributed to a serious accident at a mine.   Id. at 45.   The Court reiterated the holding in Indian Towing that "like circumstances" do not mean identical circumstances and that courts must "look further afield" in determining whether state law would hold a private person liable under like circumstances.   Id. at 46.   The proper inquiry was to determine the law applicable to a private person under state law, not the law applicable to a governmental entity.   Id. at 44–46.   The government asserted that private persons do not undertake mine safety inspections, but conceded that similar "Good Samaritan" analogies existed under state law.   Id. at 47. The Court remanded the case to the lower courts to determine which state tort law doctrine applied to the facts of this case.   Id. at 48.

As discussed above, South Dakota state law allows negligence lawsuits against one who undertakes to rescue or provide aid but does not exercise due care in so doing.   See Thompson v. Summers, 1997 S.D. 103, 567 N.W.2d 387.   However, South Dakota state law provides immunity for one who attempts to provide aid during the course of an emergency. SDCL § 20-9-4.1; In re Certification of Question of Law, 2010 S.D. 16, 779 N.W.2d 158.   As is evident from the above discussion, although Officer Romero's first trip to the scene of the Whites' accident was during an emergency, his second trip to the scene of the accident at dawn on the morning of July 5 was not during an emergency.   A reasonable jury could

28

determine that Officer Romero, in seeking to document the scene of the accident through photographs, was still attempting to render aid.   A reasonable jury might also conclude that Officer Romero acted negligently in failing to discover the Whites' vehicle.   The issue of whether the government is liable for Officer Romero's actions or omissions during his second trip to the scene of the accident presents a question of fact for the jury.

In resisting the government's motion to dismiss, Ms. White cites to various law enforcement regulations applicable to the Bureau of Indian Affairs and its officers in arguing that Officer Romero did indeed owe a legal duty to the Whites.   The government argues that duty cannot be established with reference to BIA regulations but must instead arise from South Dakota state law.

The court finds it unnecessary to resolve this particular issue at this juncture because it concludes that South Dakota state law adequately resolves the issue of the private person analog argument.   The government's argument that reference should not be made to federal regulations certainly finds support in Olson.   But the court notes that the Supreme Court in Muniz found a *federal* statute governing the duty owed by the Bureau of Prisons to its prisoners to be relevant to the inquiry of duty under the FTCA.   See United States v. Muniz, 374 U.S. 150, 164–65 (1963).   The Court's opinion in Muniz is seemingly at odds with its

29

decision in <u>Olson</u>, but both decisions continue to remain valid Supreme Court precedent.

For the reasons discussed above involving South Dakota state law, the court declines to recommend summary judgment in favor of the government with regard to the Whites' complaint on the basis of the private person analog.

### c.    The Public-Duty Doctrine

The government also argues that Ms. White's claims should be dismissed under the public-duty doctrine.   The government asserts that, under South Dakota state law, police officers are not liable for negligence because they generally have a duty to the public at large, and not to particular individuals.   See <u>Walther v. KPKA Meadowlands Ltd. P'ship</u>, 1998 S.D. 78, ¶ 17, 581 N.W.2d 527, 531.   Under the public-duty doctrine, the government argues that police cannot be held liable unless the plaintiff can show:   (1) that the officer had actual knowledge of the dangerous condition; (2) that the plaintiff reasonably relied on the police officer's representations and conduct; (3) that an ordinance or statute sets forth mandatory acts clearly for the protection of a particular class of persons, rather than the public at large, to which class the plaintiff belongs; and (4) the officer failed to use due care to avoid increasing the risk of harm.   See <u>Tipton v. Town of Tabor</u>, 538 N.W.2d 783, 787 (S.D. 1995).

However, as discussed at length above, the appropriate inquiry under the FTCA is not whether state law would hold a *police officer* liable under the facts presented.   Rather, the question is whether state law would hold a *private person* liable under the facts presented.   As the court has already determined, the answer to that question is "yes"—or at least that there is a genuine question of material fact for a jury as to that inquiry.   The government cannot have it both ways.   Under the private person analog, the government argues—properly, per Olson—that the question of liability cannot be resolved by examining whether a governmental entity could be held liable under state law.   Instead, the proper question is whether a private individual could be held liable under similar circumstances.   Having established that precept, the government cannot now take the position that a special South Dakota doctrine, applicable only to police officers and governmental units, operates to save the government from liability here.

In any event, Walther demonstrates that the public-duty doctrine does not apply under the facts of this case.   In Walther, plaintiff   Walther had been assaulted by her boyfriend.   Walther, 1998 S.D. 78, ¶¶ 1–9, 581 N.W.2d at 529–30.   An officer who responded to Walther's apartment saw her on the floor in a pool of blood.   Id. at ¶ 9, 581 N.W.2d at 530. Believing Walther to be dead, the officer shut the door to the apartment, called for assistance, and specifically refused a request for medical

31

personnel to come to the scene.   Id.   The officer's actions resulted in
Walther being denied medical care for an additional eighteen minutes after
the officer's arrival on the scene.   Id.

The South Dakota Supreme Court held that the circuit court
properly denied the officer's motion for summary judgment.   Id. at ¶ 56–
60, 581 N.W.2d at 537–38.   The court held that the public-duty doctrine
did not apply to the officer's actions because the harm alleged arose from
the officer's actions themselves rather than from the officer's failure to
protect Walther from the acts of a third party.   Id. at ¶ 57, 581 N.W.2d at
538.   "Rather, this issue involves harm allegedly caused by [the officer's]
failure to seek medical help once he came upon the scene."   Id.   Citing
the "Good Samaritan" line of cases, the court said that the officer did not
have a duty to come to the assistance of Walther, but once he did so, he
had a duty of reasonable care toward Walther.   Id.   The court observed
that the officer did more than fail to render assistance, he closed the door
to Walther's apartment, possibly excluding others who would have
rendered assistance, and he specifically refused an offer of medical
assistance on Walther's behalf.   Id. at ¶ 58, 581 N.W.2d at 538.

Officer Romero did not have specific knowledge of the plight of the
Whites when he returned to the scene of the accident at 4:30 am on the
morning of July 5.   Arguably, the officer in Walther did not know of
Ms. Walther's plight either as Walther, like the Whites, was unable to alert

the officer to her need for assistance.   The heart of the Whites' claims is that there were facts from which Officer Romero should have discerned that a second vehicle had been in an accident with the cows that night. The damages, if any, stem from Officer Romero's own actions in failing to notice—at dawn, in the light of day—that the Whites had crashed and needed help.   As in <u>Walther</u>, the public-duty doctrine does not apply here because the Whites are not claiming that Officer Romero failed to protect them from the actions of a third party.   The Whites are claiming that Officer Romero's own actions harmed them.

Accordingly, the court declines to recommend summary judgment in favor of the government with regard to the Whites' complaint on the basis of the public-duty doctrine.

### d.   Damages

Finally, the government moves for dismissal of Ms. White's claims because it argues she cannot demonstrate damages.   In the government's initial brief in this matter, the government argued that Ms. White could not demonstrate damages because, in fact, there was no delay between the actual reporting of the Whites' accident and the tribal officers' response to that report.   This argument is specious in that it ignores the obvious thrust of Ms. White's claims—i.e., that the officers should have known about the Whites' accident at least as of dawn on July 5 and, therefore, that they negligently failed to discovery the Whites.

33

However, the government also argued in its initial brief that Ms. White had not adduced any proof that the delay by the officers in discovering the Whites increased the harm occasioned by the accident itself.   See Docket No. 24, at 25–26.   Ms. White does not respond to the government's argument as to damages, other than to state that the Whites sustained serious injuries in the collision and went without medical care for ten hours because of the officers' negligence.

In Walther, the Supreme Court emphasized that it would be Walther's burden to show that the eighteen-minute delay in medical treatment occasioned by the officer's actions contributed to or increased her injuries.   Walther, 1998 S.D. 78, ¶ 59, 581 N.W.2d at 538.   Ms. White bears the same burden in this case.

Clearly Ms. White's and her mother's initial injuries were not caused by Officer Romero, so she must show that their injuries were exacerbated or contributed to by Officer Romero's negligence.   Id.   Inez Two Elk White's testimony was not preserved prior to her passing.   Lavonne Reynolds White testified at her deposition in this matter that she remembered hitting the cows that night, and then the next thing she remembered was waking up in the hospital.   See Docket No. 25-6, at 4. She remembers nothing in between.   Id.   Based on this testimony, there is no emotional distress type of damages that was caused by the delay.

The only compensable damages possible, then, would be for the worsening

34

of their initial physical injuries due to the delay in medical treatment.   At the pleading stage, it is permissible to simply allege that the delay in medical treatment exacerbated one's injuries.   This is plausible and certainly acceptable—at the pleading stage.   See FED. R. CIV. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 677–687 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560–63 (2007).

However, at the summary judgment stage—which is where we find ourselves presently—the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

In response to the government's argument that she has not shown a worsening of the accident injuries, Ms. White has cited to no evidence indicating such damages.   In her deposition, Ms. White did not testify to increased injuries as a result of the OSTPSC's delay in finding her—if she did, plaintiff's counsel has not placed that portion of the deposition before the court.   Ms. White did not present an affidavit or deposition from a physician testifying to increased or worsened damages as a result of the delay in medical treatment.   Additionally, Ms. White has not asked for time to conduct further discovery to establish such evidence.   See FED. R. CIV. P. 56(d) (allowing a party to seek additional time to

obtain affidavits or additional discovery to respond to a summary judgment motion).

The government made its argument as to damages in its initial brief in support of dismissal, so Ms. White has not been blindsided by the argument. Despite the government's argument, Ms. White has adduced no evidence of damages stemming from the OSTPSC's delay in discovering her accident.   As stated earlier, a negligence claim requires a plaintiff to prove duty, breach, causation, *and damages*.   Hendrix v. Schulte, 2007 S.D. 73, ¶ 7, 736 N.W.2d 845, 847.   The failure to adduce any evidence whatsoever as to damages dooms Ms. White's claim.   It is on this basis, ultimately, that the court recommends granting the government's motion for summary judgment.

## CONCLUSION

This court respectfully recommends that the motion for dismissal and for summary judgment filed by the United States [Docket No. 23] be denied in part and granted in part.   The court recommends denial of the government's motion to dismiss based on a lack of subject matter jurisdiction.   The court recommends granting the government's motion for summary judgment based on an absence of any evidence of damages.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.   See FED. R. CIV. P. 72(b).

36

A party may respond to another party's objections within fourteen (14) days of being served with a copy.   Id.   Failure to file timely objections will result in the waiver of the right to appeal questions of fact.   Id.   Objections must be timely and specific.   Timely, specific objections to the findings and conclusions on the summary judgment motion will be reviewed *de novo* by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990) (per curiam); Nash v. Black, 781 F.2d 665 (8th Cir. 1986); see also 28 U.S.C. § 636(b)(1)(B) (2012).

Dated April 25, 2014.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE